## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARC AND CHRISTINA ARMIJO, as the
Guardians of FREDERICK ARMIJO; DARLA
BEARY, as the Guardian of DANIEL BEARY;
MARIBEL CASTELLANOS, as the Guardian
of JAZMINE CASTELLANOS; HEATHER
JANTZ, as the former Guardian of decedent
SAMUEL JANTZ; NATASHA MORA, in her
individual capacity; KATHY PAIZ, as the
Guardian of MELVIN BENNINK; and CHRIS
ROBERTSON, as the Guardian of JUNE
MARIE, on behalf of themselves and a class of
others similarly situated,

     Plaintiffs,

     vs.                                                                      No. 25-CV-0397

UNITED STATES OF AMERICA,

     Defendant.

## <u>COMPLAINT UNDER THE PRIVACY ACT AND THE APA</u>

The Plaintiffs file this Complaint seeking an order, under the Privacy Act of 1974, 5 U.S.C.

§ 552a(b)(12), authorizing and commanding the United States to disclose those materials (in its

possession from its takeover of the Ayudando Guardians firm) subpoenaed by the Plaintiffs in

connection with their state-court class action, *see Touhy* Letter from Plfs' Counsel C. Harrison to

AUSAs R. Keegan & M. Dudley Re: "*Touhy* Request for Materials Relating to Ayudando

Guardians Inc." (dated Nov. 20, 2024) (Exhibit A to this Complaint) ("*Touhy* Letter"); *Touhy*

Subpoena to the U.S. Attorney's Office for Production of Documents (issued Nov. 20, 2024)

(served Nov. 20, 2024) (Exhibit B to this Complaint) ("USAO *Touhy* Subpoena"); *Touhy* Subpoena

to the U.S. Marshals Service for Production of Documents (issued Nov. 20, 2024) (served Nov.

20, 2024) (Exhibit C to this Complaint) ("USMS *Touhy* Subpoena"), as well as for review, under the Administrative Procedure Act, 5 U.S.C. §§ 500-706 ("APA"), of the United States' close-to-blanket refusal to comply with that subpoena, *see* Letter from AUSA E. Langenwalter to Plfs' Counsel C. Harrison Re: "Response to Second *Touhy* Request for Materials Relating to Ayudando Guardians Inc." (dated Feb. 7, 2025) (Exhibit D to this Complaint) ("*Touhy* Denial Letter").

## THE PARTIES

1.     Plaintiffs Marc and Christina Armijo are the parents and guardian of Frederick Armijo, a young man with severe birth injuries to the brain, whose medical-malpractice settlement ($166,000 worth of it) was administered by Ayudando Guardians until the firm stole all but $6,000 of it.  The Armijos are citizens of New Mexico and residents of Bernalillo County.

2.     Plaintiff Darla Beary is the mother and guardian of Daniel Beary, a young man with severe brain injuries resulting from medical malpractice whose $300,000 settlement was administered, and eventually stolen in its entirety, by Ayudando Guardians.  The Bearys are citizens of New Mexico and residents of Bernalillo County.

3.     Plaintiff Maribel Castellanos is the mother and guardian of Jazmine Castellanos, who suffered debilitating brain injuries as a result of a motor-vehicle accident that resulted in a settlement administered by Ayudando Guardians, which stole approximately $50,000 of it.  The Castellanos are citizens of New Mexico and residents of Bernalillo County.

4.     Plaintiff Heather Jantz is the father and erstwhile guardian of Samuel Joe Jantz, a U.S. Army veteran who was on 100% disability, which was paid into a trust administered by Ayudando Guardians.  Mr. Jantz passed away in 2018.  Ms. Jantz is a citizen of New Mexico and resident of Bernalillo County, as was her father when he was alive.

5.     Plaintiff Natasha Mora was an Ayudando Guardians client from roughly 2009 to 2013, needing guardianship due to a medical condition in which blood clots in her brain caused her to have regular strokes, resulting in a court declaring her incompetent and assigning Ayudando Guardians to serve as her guardian. Today her boyfriend assists her in her daily living, without a formal legal guardianship arrangement. Ms. Mora is a citizen of New Mexico and a resident of Bernalillo County.

6.     Plaintiff Kathy Paiz is the brother and guardian of Melvin Bennink, who was born with fetal alcohol syndrome, autism, and diabetes and received disability checks that were paid into a trust managed by Ayudando Guardians. The Paizes are citizens of New Mexico and residents of Doña Ana County.

7.     Plaintiff Chris Robertson is the longtime friend and guardian of June R. Marie, who has dementia, necessitating her guardianship by Ayudando Guardians from 2014/2015 to 2019. Mr. Robertson and Ms. Marie are citizens of Arizona.

8.     The Plaintiffs in this action are plaintiffs and putative class representatives in the New Mexico state-court action captioned *Armijo v. Hildebrandt*, No. D-202-CV-2024-08025 (N.M. 2d Jud. Dist.) (O'Connell, J.) ("the Class Action"), which is a class action brought against Corbin Hildebrandt and his law firm alleging that Mr. Hildebrandt engaged in professional negligence during his representation of Ayudando Guardians.

9.     The United States of America — specifically, the U.S. Attorney's Office for the District of New Mexico and/or the U.S. Marshals Service ("USMS") — is in possession of the business records of Ayudando Guardians, which were acquired when the USMS took over Ayudando Guardians' business operations under a federal court order authorizing it to operate the business so that its assets were not improperly spent or removed, and so that the interests of

Ayudando Guardians clients were protected.  The United States is also in possession of the business records of Ayudando Guardians as part of its criminal prosecution of that entity, and of its principals: Susan Harris, Sharon Moore, William Harris, and Craig Young.  *See generally United States v. Ayudando Alpha, Inc.*, No. 17-CR-1836-MV/JFR (D.N.M.) (Vázquez, J.).  An APA "action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."  5 U.S.C. § 703.  "Courts have recognized that 'when an instrumentality of the United States is the real defendant,' then the plaintiff may name as defendant 'the United States, the agency by its official title, or the appropriate officer.'  Additionally, '[t]he outcome of the case should not turn on the plaintiff's choice.'"  *Walton v. U.S. Marshals Serv.*, 2005 WL 2230151, at *3 (N.D. Cal. Sept. 13, 2005) (citation omitted) (alteration in original).

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction under the federal-question doctrine, *see* U.S. Const. Art. III, § 2, cl. 1; 28 U.S.C. § 1331, to decide this action because it presents federal questions related to the Privacy Act and the APA.

11.    Venue is appropriate in this district because the records sought through this action are in the possession of the United States Attorney's Office for the District of New Mexico, and/or the U.S. Marshal for the District of New Mexico, both of which are in the State of New Mexico. *See* 28 U.S.C. § 1391(b)(1) & (2) (authorizing the filing of a civil action in "a judicial district in which any defendant resides," or "in which a substantial part of the events or omissions giving rise to the claim occurred"); 5 U.S.C. § 703.

**FACTUAL ALLEGATIONS**

12.　　Corbin Hildebrandt, and his law firm Corbin Hildebrandt, P.C., provided legal services to Ayudando Guardians, Inc, and to other related corporate entities, which included general-counsel advice and litigation services.

13.　　Ayudando Guardians was a New Mexico-based nonprofit corporation that received government benefit payments from several federal agencies and money from private sources, which was intended for the benefit of the those that were disabled or otherwise impaired, which it was to deposit into trust accounts, act as a fiduciary of those funds, and use those funds to pay expenses for the beneficiaries of the trusts.

14.　　In 2017, it was discovered that Ayudando Guardians had engaged in a decades-long conspiracy to steal those funds from the beneficiaries of those trusts.

15.　　The result was that materially all the funds that Ayudando Guardians held or managed for the benefit of others were gone.

16.　　The leaders of Ayudando Guardians — Susan Harris, Sharon Moore, Bill Harris, and Craig Young — were eventually prosecuted for this theft and convicted in federal court.

17.　　As part of the sentencing proceedings for Susan Harris, the United States disclosed that Timothy P. Taylor, an accountant for Ayudando, sent a letter to Corbin Hildebrandt, on May 10, 2012, which informed him that:

　　　　a.　　Ayudando did not hold required corporate meetings;

　　　　b.　　Ayudando did not hold votes for the individuals that served as members of the Board of Directors of Ayudando;

　　　　c.　　Ayudando paid exorbitant and unjustified salaries to Susan Harris, Sharon Moore, Craig Young, and Bill Harris;

d.      Susan Harris, Sharon Moore, Craig Young, and Bill Harris received car allowances from Ayudando;

e.      Ayudando kept an American Express card that Susan Harris used for her own personal benefit;

f.      Cash payments ranging from $13,000 to $100,000 were made to Susan Harris, Sharon Moore, Craig Young, and Bill Harris;

g.      Susan Harris, Sharon Moore, Craig Young, and Bill Harris used Ayudando "like a personal ATM";

h.      Susan Harris and Sharon Moore had two other bank accounts with Ayudando that only they controlled even though Ayudando funds ran through those accounts; and

i.      Susan Harris misrepresented the financial health of Ayudando.

*See* Letter from Timothy Taylor to Corbin Hildebrandt (dated May 10, 2012).

18.     Rather than using this information to protect Ayudando Guardians and its beneficiaries, Mr. Hildebrandt threatened Mr. Taylor with litigation and the negotiated a settlement agreement which authorized a $11,403.17 payment to Mr. Taylor in return for Mr. Taylor keeping the information disclosed in his letter confidential. *See* Mutual Separation Agreement & General Release (executed May 11, 2012).

19.     This settlement agreement was signed just one day after Mr. Taylor disclosed the malfeasance and criminal activity occurring at Ayudando Guardians to Mr. Hildebrandt, who was the entity's attorney.

20.    Mr. Hildebrandt did not carry out any investigation to determine the scope of the fraud, malfeasance, and criminal activity carried out by Susan Harris, Sharon Moore, Craig Young, and Bill Harris.

21.    Susan Harris, Sharon Moore, Craig Young, and Bill Harris then continued their illegal scheme.

22.    The scheme resulted in the spending of more than $4.4 million of money that should have been held to benefit others being spent for personal expenses using the American Express card that was identified in Mr. Taylor's letter.

23.    Susan Harris, Sharon Moore, Craig Young, and Bill Harris took vacations to Hawaii and cruises paid for with money that should have been kept in trust to benefit others.

24.    This included $17,000 for a Celebrity Cruise to the Caribbean in 2013, $20,000 for the same cruise in 2014, nearly $40,000 for a Regent Seven Seas cruise, and $19,821 to Norwegian Cruise Lines in 2017.

25.    Sharon Moore also paid for two vacations to San Diego in 2015 and 2016, which amounted to more than $12,000.

26.    Susan Harris, Sharon Moore, Craig Young, and Bill Harris purchased homes in a gated community, new cars, and recreational vehicles with funds that should have been kept in trust for others.

27.    For example, Susan Harris and Sharon Moore paid $50,950 of Ayudando Guardians funds to Mercedes Benz of Albuquerque in 2011.

28.    Susan Harris and Bill Harris lived in a home valued at $540,700 that was paid for with funds they stole from Ayudando Guardians clients and beneficiaries.  Susan Harris and Bill Harris used another $206,970 in Ayudando Guardians money to pay for Craig Young's mortgage.

29.     Susan Harris, Sharon Moore, Craig Young, and Bill Harris maintained a luxury suite at The Pit to attend University of New Mexico basketball games, often running up nightly bills of more than $3,000. The total costs of the luxury suite exceeded $300,000. These costs were also paid for with money that should have been kept in trust for Ayudando Guardians clients and beneficiaries.

30.     Susan Harris and Sharon Moore also wrote checks from Ayudando Guardians accounts for their own use.  For example, a check for $61,426 was made out to Susan Harris in 2012 and several multi-thousand-dollar checks were made out to cash.

31.     Mr. Hildebrandt then took actions to cover up his knowledge and professional negligence.

32.     For example, on May 25, 2017, Mr. Hildebrandt sent a letter to several companies that insured Desert State Life Management — a company like Ayudando Guardians that had also stolen client funds — requesting that they preserve evidence and produce information related to potential claims against those insurance companies, alleging that Desert State Life Management had stolen funds from Ayudando Guardians clients.

33.     On June 6, 2017, Mr. Hildebrandt filed a lawsuit on behalf of Ayudando Guardians against Desert State Life Management, Paul A. Donisthorpe, and L. Helen Bennett seeking to recover money stolen from trusts that Ayudando Guardians had invested with Desert State Life Management.

34.     On July 11, 2017, Ayudando Guardians, Susan Harris, and Sharon Moore were indicted in the District of New Mexico for conspiracy, fraud, theft, and money laundering based on their scheme to steal client funds from Ayudando Guardians.  Craig Young and Bill Harris were later indicted as well.

35.    On August 31, 2017, the USMS took over management responsibilities of Ayudando Guardians.

36.    Susan Harris, Sharon Moore, Craig Young, and Bill Harris were all convicted of crimes related to this scheme.

37.    The Honorable the Honorable Martha A. Vázquez, U.S. District Judge for the District of New Mexico, summed up Mr. Hildebrandt's complicity in the scheme at the sentencing hearing for Susan Harris:

> The Defendants' efforts at concealing their fraud were not always successful, however.  In 2012, Ayudando's tax accountant realized that the Harris family was using the company for their personal gain.  ***He then wrote a letter to Ayudando's attorney laying out his concerns***, including that Ms. Harris was violating nonprofit disclosure laws, paying family members inflated salaries, paying vehicle allowances for her co-defendants with business funds, using American Express cards for personal use, making improper loans from the businesses to the Harris family, and denying him access to corporate accounts.  Instead of ceasing their illegal activities, however, Mr. and Mrs. Harris entered into a mutual separation agreement with the tax accountant, whereby he agreed to turn over his records and not criticize the Harrises or Ayudando in exchange for $11,403.17 bill for services.  ***By paying off this accountant, the Defendants were able to keep the conspiracy alive for several more years.***

*United States v. Ayudando*, Transcript of Sentencing Hrg. at 192:5-20 (Doc. 325) (taken Mar. 2, 2020) (filed Apr. 26, 2021) (emphases added).

38.    On October 13, 2024, the Plaintiffs, on behalf of themselves and all other victims of Ayudando Guardians, filed the Class Action[1] against Corbin Hildebrandt and Corbin Hildebrandt, P.C., alleging that Mr. Hildebrandt engaged in professional negligence, breach of

---

[1] The Class Action is a continuation (under the New Mexico Savings Statute, NMSA 1978, § 37-1-14, *American Pipe* tolling, and equitable-tolling principles) of an earlier case, *Reeder v. Hildebrandt*, No. D-202-CV-2022-07504 (N.M. 2d Jud. Dist.) (Allison, J.), in which the Plaintiffs were absent plaintiffs (members, but not representatives, of the putative class).

fiduciary duty, negligent misrepresentation, and intentional misrepresentation during his representation of Ayudando Guardians.

39.     On November 20, 2024, the Plaintiffs served the *Touhy* Subpoenas and Letter on the United States Attorney's Office for the District of New Mexico, requesting nine categories of documents:

a.     A document with the names and contact information of, and if available, the names and contact information of the present-day guardians of, all known clients/wards of Ayudando Guardians Inc., or, if no such single document exists, then a collection of documents from which the same information can be obtained

b.     All discovery produced by the United States under Fed. R. Crim. P. 16(a) to any Defendant in the federal criminal case number 17-CR-1836-MV/JFR

c.     All documents associated with the aforementioned case 17-CR-1836 (to the extent that this qualifier is unclear, we are willing to accept the objective test of whether the document in question was kept in files dedicated to that case by the Assistant United States Attorneys assigned to represent the Government in the case) that were written by Corbin Hildebrandt, including email correspondence with your office

d.     Spreadsheets detailing the financial losses suffered by each client/ward of Ayudando Guardians Inc., and any materials prepared or curated by forensic accountants to support, substantiate, or explain the spreadsheet figures

e.     All documents evidencing payments from Ayudando Guardians Inc., Susan Harris, Sharon Moore, William Harris, or Craig Young to either Corbin

Hildebrandt, Corbin Hildebrandt, P.C., or another entity known to you to be owned

in while or in part by Corbin Hildebrandt

   f.    All emails, letters, and memoranda associated with the

aforementioned case 17-CR-1836 and written before July 11, 2017 (the date of

initiation of criminal proceedings against Ayudando Guardians Inc.) that indicate

that they were sent, copied, or blind-copied to Corbin Hildebrandt

   g.    All financial records of Ayudando Guardians reflecting transactions

made prior to July 11, 2017

   h.    All documents prepared by any forensic accountant working for or

with the Federal Bureau of Investigation and transmitted to Assistant United States

Attorneys Jeremy Pena, Brandon Fyffe, or Stephen Kotz in association with the

aforementioned case 17-CR-1836

   i.    All documents that include the name or other identifying

information of any of the Plaintiffs in this case, or that refer or relate to any of the

Plaintiffs (specifically, meaning that you need not include documents that generally

refer to all Ayudando victims)

*Touhy* Subpoenas ¶¶ 1-9, at 2 (Exs. B & C).

   40.    The *Touhy* Subpoenas were accompanied by the *Touhy* Letter and a proposed

HIPAA-qualified umbrella protective/confidentiality order.  *See* Proposed HIPAA-Qualified

Umbrella Protective Order (Exhibit E to this Complaint).  The *Touhy* Letter lays out the reasons

that the materials requested in the *Touhy* Subpoenas are producible under the DOJ's *Touhy*

regulations and discoverable under the New Mexico Rules of Civil Procedure.

41.     A copy of the *Touhy* Subpoenas, and returns of service on the United States Attorney's Office for the District of New Mexico, were filed the Class Action to allow Corbin Hildebrandt or Corbin Hildebrandt, P.C. to object to the *Touhy* Subpoenas.

42.     Neither Corbin Hildebrandt nor Corbin Hildebrandt, P.C. filed any objections or moved to quash the subpoena prior to the expiration of the 14-day deadline to do so under the New Mexico Rule of Civil Procedure for the District Courts.  *See* Rule 1-045(C)(2)(b)(ii) NMRA ("[A]ny party who objects to the subpoena shall, within fourteen (14) days after service of the subpoena, serve on the person served with the subpoena and all parties written objection to or a motion to quash inspection, copying, testing, or sampling of any or all of the designated materials or inspection of the premises.").

43.     The United States, represented by AUSA Erin Langenwalter, requested a couple of extensions to consider and respond to the *Touhy* request, which the Plaintiffs agreed.  On February 7, 2025, AUSA Langenwalter issued the *Touhy* Denial Letter.

44.     The *Touhy* Denial Letter refused to produce anything in response to the *Touhy* request, with the exception of a single victim-loss spreadsheet for the named Plaintiffs alone.  *See Touhy* Denial Letter at 5 (Ex. D).

45.     The Plaintiffs served the *Touhy* Subpoena and sought this information from the USMS and the United States Attorney's Office for the District of New Mexico because there is no other source of the requested information.

46.     The Plaintiffs have a real and significant need for this information.

47.     Such information is usually sought from a defendant in a class action — were Ayudando Guardians still in business, it would have been named as a defendant in the Class Action, and this material would be produced as first-round discovery.  This case, however, presents a class

claim against a third party (Ayudando's outside general counsel) that does not possess the information requested in the subpoena.

48.    Normal discovery procedures cannot be used to acquire the documents sought by the *Touhy* Subpoena, because Ayudando Guardians was taken over by the federal government.  In fact, the Plaintiffs attempted to obtain the information through normal discovery procedures but were unable to do so because of the Privacy Act.  Therefore, any disclosure by the United States Attorney's Office, which is undoubtedly a government agency under the Privacy Act, requires an order from this Court.

49.    Moreover, each set of information is necessary for the prosecution of their lawsuit.

50.    For example, names and contact information of other clients/wards of Ayudando Guardians is necessary to identify potential class numbers, litigate numerosity as related to the class action allegations, and identify the amounts of money stolen from each class member. The same is true for documents prepared by any forensic accountant as part of criminal prosecutions.

51.    The discovery produced by the government under Fed. R. Crim. P. 16(a) is necessary because it includes evidence of the scheme carried out by Ayudando Guardians, Susan Harris, Sharon Moore, Bill Harris, and Craig Young.  Proof of that scheme is necessary to prove up the Plaintiffs' claim of professional negligence because that claim, in part, involves Mr. Hildebrandt's covering up on the scheme.

52.    Documents written by Corbin Hildebrandt, including email communications that he may have had with the United States Attorney's Office, are necessary to the claim because the Plaintiffs alleged in the class action complaint that Mr. Hildebrandt engaged in a course of action to cover up his professional negligence once it became clear that the scheme carried out by Ayudando Guardians, Susan Harris, Sharon Moore, Bill Harris, and Craig Young would be

discovered.  The same is true for emails, letters, and memoranda that were sent, copied, or blind-copied to Corbin Hildebrandt prior to the public disclosure of Ayudando's criminal conduct.

53.    Documents related to the financial losses of each client/ward are necessary for the prosecution of the Class Action because those documents are the only records that could be used to establish the damages suffered by the class.  Such records will also be necessary evidence at the class certification stage as part of the commonality prong of Rule 23.  The same is also true of financial records of Ayundado Guardians reflecting transactions made prior to July 11, 2017.  And the same is true for the request for documents prepared by any forensic accountant working for the FBI or with the United States Attorney's Office as part of the criminal prosecutions.

54.    Documents related to payments made from Ayudando Guardians, Inc., Susan Harris, Sharon Moore, William Harris, and Craig Young to Corbin Hildebradnt or Corbin Hildebrandt, P.C. are also necessary to determine damages as alleged in the class action complaint.

55.    There is no likelihood of harm to any of the clients or beneficiaries of Ayudando Guardians, Inc. because the Plaintiffs have already agreed to enter into a confidentiality order protecting the requested information from public disclosure.

56.    There is also no likelihood of harm to any of the clients or beneficiaries of Ayudando Guardians, Inc. because the Plaintiffs only intention in obtaining the information is to prosecute a civil action to recover damages for the money that was stolen from them by Ayudando Guardians, which was rubber stamped and covered up by Corbin Hildebrandt.

### CLASS DEFINITION AND ALLEGATIONS

57.    Pursuant to Rule 10(c), the Plaintiffs incorporate all preceding allegations as if fully restated herein.

58.    The Plaintiffs do not believe that class certification in this case is necessary for them to obtain the full relief they seek here: they are putative class representatives in the Class Action, which gives them a sufficient interest in the materials sought (by way of their representative interests as recognized in the Class Action) to warrant the relief herein requested even without class certification in this case.

59.    However, should the Court deem class certification in this case to be necessary, this action is properly maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Note that, in the Class Action, class certification will proceed under Rule 1-023(B)(3) NMRA, because damages are sought in that suit.  Here, however, because the United States "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," the lower bar of Rule 23(b)(2) is appropriate.  Certification under Rule 23(b)(2) has been held to be appropriate in APA case.  *See*, *e.g.*, *California v. Yamasaki*, 442 U.S. 682, 700-02 (1979); *Lyons v. Weinberger*, 376 F. Supp. 248, 263 (S.D.N.Y. 1974); *Lawyer v. Valdez*, 763 F. Supp. 1562, 1566 (D.N.M. 1990) (Conway, J.).

60.    The proposed class definition is: "All individuals who were Ayudando clients from May 10, 2012 until August 31, 2017."  This definition mirrors the class definition in the Class Action.

61.    The proposed class definition is precise, objective and presently ascertainable, and it is administratively feasible for the Court to ascertain whether a particular individual is a member of the class.

62.    The members of the class are so numerous that joinder of all members of the Class is impracticable.

63. The claims of the Plaintiffs are typical of the claims of the class.

64. Certification of the class is desirable and proper because there are questions of law and fact common to all members of the class. Such common questions of law and fact include, but are not limited to:

a. whether the United States erred in refusing production of Privacy Act-covered materials pursuant to the *Touhy* requests;

b. whether Corbin Hildebrandt and/or his law firm are liable to each class member because of his professional negligence while serving as legal counsel for Ayudando Guardians;

c. whether there was common impact as to each class member, without resorting to lengthy individualized examinations;

d. whether Corbin Hildebrandt and/or his law firm had a duty to the class members;

e. whether Corbin Hildebrandt and/or his law firm knew or should have known that Susan Harris, Sharon Moore, Craig Young, and Bill Harris were breaching a fiduciary duty owed to Ayudando Guardians' clients;

f. whether, because of Ayudando Guardians' pattern and practice of frequent and significant withdrawals from client accounts, Corbin Hildebrandt and/or his law firm should have acted to preserve or taken action reasonably calculated to preserving the funds belonging to Ayudando's clients and Ayudando client's trust accounts;

g. whether Corbin Hildebrandt and his law firm benefited in any way from Ayudando's fraud; and

h.     whether the damages incurred by each class member are ascertainable by a common methodology considering data about Ayudando accounts.

65.    Certification of the class is desirable and proper because the Plaintiffs will fairly and adequately protect the interests of the class that they seek to represent.

66.    There are no conflicts of interest between the Plaintiff's claims and those other members of the class.

67.    The Plaintiffs are aware of their duties and responsibilities to the class.

68.    The Plaintiffs' attorneys are qualified, experienced, and able to conduct the proposed class action.

**COUNT 1**
**FOR A § 552a(b)(12) ORDER UNDER THE PRIVACY ACT**

69.    Pursuant to Rule 10(c), the Plaintiffs incorporate all preceding allegations as if fully restated herein.

70.    The Privacy Act governs the federal government's collection, maintenance, use, and dissemination of "information about [] individual[s] . . . , including, but not limited to, [their] education, financial transactions, medical history, and criminal or employment history and that contains [their] name" or other personal identifying information — this type of information is called a "record" under the Privacy Act.  *See* 5 U.S.C. § 552a(a)(4).  The parties do not dispute that the materials sought by the *Touhy* subpoena in this case are records under the Privacy Act.

71.    Both the United States Attorney's Office for the District of New Mexico and the USMS are government agencies subject to the Privacy Act.  *See* 5 U.S.C. 552(f) (defining agency as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government").

72.     The records sought through this action, which were requested by way of the *Touhy* Subpoena, are maintained in a "system of records." 5 U.S.C. 552a(a)(5) (explaining that a system of records is a collection of documents organized in such a way that they are retrievable by name, or some other identifier assigned to the individual).

73.     Subsection (b) of the Privacy Act permits disclosure of records under 12 circumstances, including broad freedom for intra-agency disclosure, *see* § 552(b)(1); a narrower allowance for inter-agency disclosure, *see id.* (b)(7); "routine use," which is use that is "compatible with the purpose for which [the record] was collected" in the first place, *id.* (b)(3) & (a)(7); a number of highly specific provisions, *see* (b)(4), (6), (9), (10) & (12), and, relevant here, "pursuant to the order of a court of competent jurisdiction," *id.* (b)(12).

74.     The *Touhy* Subpoena served on the United States does not, by itself, constitute an order of a court of competent jurisdiction because the New Mexico Rules of Civil Procedure for the District Courts do not require a state district court to approve of or issue subpoenas for documents; they are instead prepared and served by counsel. *See Stiles v. Atlanta Gas Light Co.*, 453 F. Supp. 798, 800 (N.D. Ga. 1978) ("Mere issuance in discovery proceedings of a subpoena which is always subject to the power of the court to quash or limit does not meet the[s] standard [of Section 552a(b)(12)].").

75.     In the context of records sought in civil litigation — regardless whether the litigation is brought by or against either the federal government, the persons whose privacy interests are implicated by the records, both, or neither — the § 552a(b)(12) court-order requirement is a strictly procedural one, and the substantive standard for whether the record-seeker is entitled to the records is governed by law extrinsic to the Privacy Act itself, usually the discovery law of the forum in which the litigation is pending. The seminal case establishing this, which

comes out of the D.C. Circuit but has since been endorsed by the Tenth Circuit, is *Laxalt v. McClatchy*, 809 F.2d 885, 888 (D.C. Cir. 1987), which held:

> The Privacy Act[ ] does not create a qualified discovery privilege as that concept is generally understood, and we find no basis in the statute or its legislative history for inferring one. Nor does the Act create any other kind of privilege or bar that requires a party to show actual need as a prerequisite to invoking discovery. Rather, the plain language of the statute permits disclosure "pursuant to the order of a court of competent jurisdiction." Neither the statute nor anything in its legislative history specifies the standards for issuance of such a court order. We therefore find no basis for inferring that the statute replaces the usual discovery standards of the FRCP — in particular, Rules 26 and 45(b) — with a different and higher standard.

> It is well-settled in this circuit that general statutory bans on publication do not bar limited disclosure in judicial proceedings, including court-supervised discovery. We have noted that "where Congress has thought it necessary to protect against court use of records it has expressly so provided by specific language." We have therefore refused to infer the creation of a qualified privilege from congressional silence. Such an inference is even less justifiable where, as in the Privacy Act, Congress has expressly *permitted* court-ordered disclosure.

> Once again, we indicate that, absent an express congressional intent to the contrary, the standards set forth in the FRCP must be followed with respect to discovery requests in District Court. We therefore hold that a party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1) of the FRCP.

*Laxalt*, 809 F.2d at 888-89 (citations omitted) (emphasis in original); *id.* at 890 (rejecting the proposition "that merely because records are subject to the Privacy Act they are exempt in their entirety from civil discovery absent a specific showing of 'need,'" because "[t]his so-called 'need' analysis simply finds no support in the case law of this circuit or in the Privacy Act itself").

76.    Even before *Laxalt*, the Tenth Circuit had already adopted the same basic reasoning, but it would expressly embrace the opinion several years later:

> [T]he Privacy Act, 5 U.S.C. § 552a(b)(1[2]), prohibits release of personnel files without a court order. This objection, however, does not state a claim of privilege;

a court order is merely one of the "conditions of disclosure." *Id.* § 552a(b) (heading). A court order under Fed. R. Civ. P. 37 in response to Weahkee's motion to compel discovery would meet the standards of that Act.

. . . .

        The question therefore is whether these documents were discoverable in the absence of a privilege. The test for determining whether material is discoverable is relevancy. [The Rules] no longer require[] that the party seeking discovery show good cause for its request.

*Weahkee v. Norton*, 621 F.2d 1080, 1082 (10th Cir. 1980); *see also Pippinger v. Rubin*, 129 F.3d 519, 532 (10th Cir. 1997) ("To avoid circularity, the qualifier "non-privileged" can only refer to privileges existing outside of the Privacy Act itself, such as the attorney-client privilege or the doctor-patient privilege.") (quoting *Laxalt*, 809 F.2d at 888, for the proposition that "the 'pursuant to the order of a court of competent jurisdiction' exception to the Privacy Act (5 U.S.C. § 552a(b)(1[2])) . . . does not create any additional privileges that would collide with the federal civil rules of discovery").

        77.    In short, the standard for whether the Plaintiffs are entitled to a § 552a(b)(12) order for the records sought by the Plaintiffs here is whether the records are discoverable — relevant, non-privileged, etc. — under Rules 1-026 and 045 NMRA, which are broader than, but generally extremely comparable to, Federal Rules of Civil Procedure 26 and 45. The *Laxalt* court has held, however, that the fact that materials are subject to (*i.e.*, "records" under) the Privacy Act may weigh in favor of conditioning disclosure upon the entry of a suitable protective order. *See Laxalt*, 809 F.2d at 889 ("The fact that a document is subject to the Privacy Act is not, however, irrelevant to the manner in which discovery should proceed. Although discovery standards under the FRCP permit access to relevant documents protected by the Act, those same FRCP standards give the District Court ample discretion to fashion appropriate protective orders upon a showing of 'good

cause.' . . . [A]s is true with respect to other statutory publication bans, the applicability of the Privacy Act to the materials requested is a relevant factor for the District Court to consider in determining the appropriate scope and manner of discovery in a given case." (citation omitted)). Although the Tenth Circuit has never specifically embraced this portion of the *Laxalt* holding, it does seem to be, as the *Laxalt* court suggested, part and parcel of Federal Civil Rule 26(c) (and Rule 1-026(C) NMRA).

78.    The withheld documents are necessary to the prosecution of the Class Action.

79.    The withheld documents cannot be otherwise obtained from a party to that litigation or through normal discovery practices.

80.    The withheld documents are clearly discoverable under Rule 1-026 and 1-045 of the New Mexico Rules of Civil Procedure.

81.    There is no risk of harm to any of the individuals identified in those withheld documents.

82.    An order from a court of competent jurisdiction is therefore necessary for the United States to produce the withheld documents, and the Plaintiffs are entitled to such an order. *See* 5 U.SC. § 552a(b)(12).

83.    An order reversing the *Touhy* Denial under the APA is one well-accepted form of § 552a(b)(12) order, and that is requested in Count 2 of this Complaint.  Count 1 requests a § 552a(b)(12) by way of a claim brought under the Privacy Act itself, under the Declaratory Judgment Act, 28 U.S.C. § 2201-2202, *see* Fed. R. Civ. P. 57, and/or as a miscellaneous action like the action in the aforementioned *Laxalt* case.  The differences between the two forms of relief, as the Plaintiffs understand them, are: (a) the United States is not entitled to any APA-associated deference under Count 1; but (b) the relief requested under Count 1 merely *allows* the United

States to produce the requested documents, whereas the relief requested under Count 2 would *compel* production.

## COUNT 2
## FOR REVIEW AND REVERSAL OF THE *TOUHY* DENIAL UNDER THE APA

84.     Pursuant to Rule 10(c), the Plaintiffs incorporate all preceding allegations as if fully restated herein.

85.     The federal Housekeeping Statute provides: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. ***This section does not authorize withholding information from the public or limiting the availability of records to the public.***"  5 U.S.C. § 301 (emphasis added).

86.     The first portion of the Housekeeping Statute (the non-emphasized portion) has existed in some form since virtually the Founding.  *See* Don Lively, *Governmental Housekeeping Authority: Bureaucratic Privileges Without a Bureaucratic Privilege*, 16 Harv. Civ. Rights & Civ. Liberties L. Rev. 495, 498 (1981).  Although it is highly questionable whether the statute was ever intended to serve as an independent basis for the federal government to decline to disclose documents in response to a subpoena, by the mid-20th Century, a handful of cases, most famously *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), had held that the Housekeeping Statute did allow for the promulgation of executive-agency regulations that conditioned the production of agency documents (and the production of agency employees for testimony) in response to a subpoena.  *See* Lively, *supra* at 499.

87.    In 1958, however, almost certainly in response to the *Touhy* case, Congress added the second (emphasized above) sentence to § 301, making clear that the Housekeeping Statute could not be used in this manner.  As the Ninth Circuit noted back in 1991, and the Honorable James O. Browning found in late 2024 — in the wake of the U.S. Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*") — there is simply no basis to allow the United States to use its *Touhy* regulations to block production of evidence that would otherwise be discoverable under the rules of the forum from which a subpoena issued:

> Every commentator we are aware of who has addressed the issue has reached the same conclusion.  *See* 8 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 2019, at 165-66 (1970 & 1994 Supp.) (The 1958 amendment "has made it clear beyond doubt that the 'housekeeping' statute does not in itself create a privilege when no privilege would otherwise exist."); Gregory S. Coleman, Note, Touhy *and the Housekeeping Privilege: Dead but not Buried?*, 70 Tex. L. Rev. 685, 689 & n.20 (1992) ("The proposition for which *Touhy* is often cited — that a government agency may withhold documents or testimony at its discretion — simply is not good law and hasn't been since 1958."); Robert R. Kiesel, Note, *Every Man's Evidence and the Ivory Tower Agencies: How May a Civil Litigant Obtain Testimony From an Employee of a Nonparty Federal Agency?*, 59 Geo. Wash. L. Rev. 1647, 1656 (1991) (after the 1958 amendment "the Housekeeping Statute does not authorize nondisclosure regulations"); Don Lively, *Government Housekeeping Authority: Bureaucratic Privileges Without a Bureaucratic Privilege*, 16 Harv. C.R.-C.L. L. Rev. 495, 500 (1981) ("As the legislative history accompanying the 1958 amendment to the housekeeping statute shows, Congress intended that the statute itself should not double as a form of privilege.").

*Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778 n.6 (9th Cir. 1994). Here, the Housekeeping Statute does not have the "force and effect of law" to bar from APA review the Interior Department's responses to *Touhy* requests.  Because the Interior Department's *Touhy* regulations are not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and because the Housekeeping Statute does not authorize agencies from withholding information to the public, the Court,

therefore, concludes that it has subject-matter jurisdiction over the Interior Department's response to Aero Tech's *Touhy* request.

*Aero Tech, Inc. v. U.S. Dep't of the Interior*, 2024 WL 4581545, at *14 (D.N.M. Oct. 25, 2024) (Browning, J.).

88.     The Department of Justice's *Touhy* regulations are found in 28 C.F.R. §§ 16.21-29, with additional interpretive gloss found in §§ 1-6.100 to 640 of the *Justice Manual* (until recently known as the *U.S. Attorneys' Manual*).  *Touhy* regulations purport to apply to subpoenas issued in both state and federal court — the major divide in most agencies' regulations (including the Justice Department's) is between cases in which the United States is a party to the action and those where it is a nonparty (although the former category of cases will, obviously, always be in federal court).

89.     When the United States is not a party to the litigation from which the subpoena is issued, there is a two-part test for disclosure, asking first whether "[t]he demanded disclosure, in the judgment of the responsible official, is appropriate under the factors specified in § 16.26(a) of this part," and second ensuring that "[n]one of the factors specified in § 16.26(b) of this part exists with respect to the demanded disclosure."  28 C.F.R. § 16.24(b)(2)-(3).  Section 16.26(a) is in turn a two-part inquiry asking "[w]hether [the requested] disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose," and "[w]hether disclosure is appropriate under the relevant substantive law concerning privilege."  Section 16.26(b), on the other hand, prohibits disclosure if any one of the following apply:

(1)     Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, Fed. R. Crim. P. 6(e),

(2)     Disclosure would violate a specific regulation;

(3)     Disclosure would reveal classified information, unless appropriately declassified by the originating agency,

(4)    Disclosure would reveal a confidential source or informant, unless the investigative agency and the source or informant have no objection,

(5)    Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired,

(6)    Disclosure would improperly reveal trade secrets without the owner's consent.

28 C.F.R. § 16.26(b).

90.    While (b)(1), (2), and (3) constitute absolute prohibitions against disclosure, materials covered by (b)(4), (5), or (6) can still be disclosed if "the administration of justice requires disclosure," which requires the federal agency to consider the following factors:

(1)    The seriousness of the violation or crime involved,

(2)    The past history or criminal record of the violator or accused,

(3)    The importance of the relief sought,

(4)    The importance of the legal issues presented,

(5)    Other matters brought to the attention of the Deputy or Associate Attorney General.

28 C.F.R. § 16.26(c).

91.    The basis for the United States' *Touhy* Denial Letter here is § 16.26(b)(1), *i.e.*, that "[d]isclosure would violate a statute," namely the Privacy Act, and the United States agrees that there will be no violation once and if this Court enters an order under 5 U.S.C. § 552a(b)(12).

92.    Denials of *Touhy* requests can be reviewed under the APA.  *See*, *e.g.*, 9A Wright & Miller, *Federal Practice & Procedure — Civil* § 2463.2 (3d ed. 2023) (stating that, when the

federal government refuses to produce documents (or testimony) pursuant to a state-court subpoena, "a state court litigant is to bring a separate action in federal court under the Administrative Procedure Act ('APA') to challenge the agency's decision not to comply" (footnote omitted)).

93.      Under the APA, a federal district court can reverse a final agency action — and the *Touhy* Denial is a final agency action — if the action is:

(A)      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)      contrary to constitutional right, power, privilege, or immunity;

(C)      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)      without observance of procedure required by law;

(E)      unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)      unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

94.      The Plaintiffs contend that the *Touhy* Denial Letter is arbitrary and capricious, an abuse of discretion, not in accordance with law, short of statutory right, and unsupported and unwarranted by the facts, for, *inter alia*, the reasons given in the *Touhy* Letter itself and in this Complaint.  The Plaintiffs also contend that it was without observance of the procedures required by law, in that the United States failed to analyze the requests in the *Touhy* Subpoena under its own *Touhy* regulations or the procedural rules of the forum (Rules 1-026 and 1-045), provide specific

feedback on the reasons for the denial and how to rectify them, or work with the Plaintiffs in good faith to make production or tee up the disputes quickly.

## PRAYER FOR RELIEF

The Plaintiffs hereby pray that this Court grant the following forms of relief to resolve the actual controversy between the parties:

A.    a § 552a(b)(12) order under the Privacy Act;

B.    a reversal of the *Touhy* Denial;

C.    an order compelling the United States to produce the documents sought in the *Touhy* Subpoena;

D.    a declaration that the materials sought by the *Touhy* Subpoena are discoverable under state law, producible under the DOJ's *Touhy* regulations, and should be produced notwithstanding the Privacy Act;

E.    attorney fees and costs under the Equal Access to Justice Act, 5 U.S.C. § 504 & 28 U.S.C. § 2412, Rule 54(d), and/or any other legal basis; and

F.    any other relief allowed by law and that the Court deems just and appropriate.

Respectfully submitted,

HARRISON & HART, LLC

By: _____
    Carter B. Harrison IV
    Nicholas T. Hart
    Elise C. Funke
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel:  (505) 295-3261
Fax:  (505) 341-9340
Email:  carter@harrisonhartlaw.com

*Attorneys for the Plaintiffs*

**Exhibit List**

Ex. A:  *Touhy* Letter  (9 pages)
Ex. B:  USAO *Touhy* Subpoena  (7 pages)
Ex. C:  USMS *Touhy* Subpoena  (7 pages)
Ex. D:  *Touhy* Denial Letter  (5 pages)
Ex. E:  Proposed HIPAA-Qualified Protective Order  (7 pages)